IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN  DIVISION

NO: 2:15-CV-27-FL

| | | |
|---|---|---|
| COLONY TIRE CORPORATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | ORDER |
| v. | ) | |
| | ) | |
| FEDERAL INSURANCE COMPANY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the parties' cross-motions for summary judgment.  (DE 23, 26).  The motions have been fully briefed, and, in this posture, the issues raised are ripe for ruling.  For the reasons that follow, defendant's motion is denied, and plaintiff's motion is granted.

## BACKGROUND

Plaintiff initiated this action in the Superior Court Division of Chowan County, North Carolina, on June 15, 2015, seeking declaratory relief pursuant to N.C. Gen. Stat. § 1-253 et seq., regarding coverage under an insurance policy ("the policy").  (DE 1-2).  Defendant removed the action to this court and answered on July 21, 2015.  (DE 1, 7).  The parties filed cross-motions for summary judgment on August 15, 2016, (DE 23, 26), and responses timely followed.  (DE 30–35).

In support of its motion, plaintiff relies upon the policy,  records of a federal criminal matter in the U.S. District Court for the Western District of North Carolina, No. 3:14-cr-199-FDW-1 & No. 3:14-cr-199-FDW-2, a deposition taken from defendant's representative, and exhibits referenced therein pertaining to defendant's denial of plaintiff's claims and to the embezzlement giving rise to

this case. (DE 18). Defendant relies on the same evidence of record and, in addition, two depositions taken from plaintiff's representatives. (DE 19).

## STATEMENT OF THE UNDISPUTED FACTS

On July 3, 2013, defendant issued the policy to cover, on a claims-made basis, various types of losses that plaintiff might incur in the course of its operations. (DE 19-3 at 114). The policy includes a "crime coverage part," which provides coverage for, among other things, "employee theft" and "funds transfer fraud" as defined in the policy and discussed in further detail herein. (DE 19-3 at 170–71). Plaintiff filed a claim, on April 9, 2014, pursuant to the crime coverage part seeking reimbursement from an embezzlement that caused plaintiff to lose $492,350.53 between 2002 and 2014. Defendant denied coverage. Plaintiff now seeks declaratory judgment that the policy covers losses incurred due to the embezzlement, the nature of which is summarized as follows.

Plaintiff is a retailer of automotive parts and service. On or around August 1, 2002, plaintiff entered into a contract with Employee-Services.net ("ESN"), a North Carolina corporation, under which plaintiff authorized ESN to withdraw funds from a designated bank account to pay plaintiff's payroll and taxes. (DE 29-7). However, on March 5, 2014, plaintiff discovered that William James Staz and James William Staz (collectively "the Stazes"), founders, sole owners, and managers of ESN, were embezzling money from ESN's clients. (DE 29-8). During the relevant time period, James Staz was the principal financial manager, vice president, and eventually president of ESN, (DE 29-4, ¶ 6, at 2), while William Staz was the day-to-day director and manager of ESN's operations. (DE 29-4, ¶ 7, at 2). Of note, William Staz's duties "includ[ed] the preparation of corporate taxes and reports and daily operation of the company." (DE 29-4, ¶ 7, at 2).

2

In January and March 2015, the Stazes pleaded guilty in the U.S. District Court for the Western District of North Carolina to embezzling over $14 million, including $492,350.53 from plaintiff. (De 18-2 at 7–15). According to the grand jury indictment

> 1. From in or about at least 2008 through in or about March 2014, the defendants JAMES WILLIAM STAZ and WILLIAM JAMES STAZ, through their third party payroll processing company Employee-Services.Net., Inc. ("ESN"), defrauded ESN clients by fraudulently collecting over $11 million from those clients and falsely claiming that the funds would be used to pay federal and state employment taxes when, in reality, the taxes were never paid or paid late and the funds were used to support JAMES and WILLIAM STAZ's lifestyles.

> 2. During this same time period, JAMES STAZ embezzled at least $3.7 million in client funds intended for payroll and employment tax payments by diverting funds from ESN accounts and making it appear that the transfers were made on behalf of actual ESN clients when, in reality, the transfers went directly to JAMES STAZ's personal bank account. JAMES STAZ used this money to pay for alcohol, strip clubs, jewelry, a Mercedes Benz and a luxury home with a lavish three-tiered pool, a cascading waterfall, wet bar, and dining area.

(DE 29-4, ¶ 1–2, at 1). That court entered judgment against James Staz and sentenced him to a term of imprisonment of 135 months and to pay $17 million in restitution. (DE 29-5 at 2–7). William Staz committed suicide before sentencing. (DE 19-1 at 42).

For almost a decade, the Stazes were able to conceal their embezzlement by "collecting funds for a current payroll/tax period from [ESN's] clients, comingling [sic] the client funds and then using those funds to pay the previous period's payroll and employment taxes." (DE 29-4, ¶ 17, at 3–4). Additionally, the Stazes "sent regular emails and wire transmissions falsely stating that all federal, state and local employment taxes were paid when, in reality, the taxes for some portion of the ESN client base were unpaid or paid late, thus accruing penalties." (DE 29-4, ¶ 18, at 4). However, by 2014, the scheme was no longer sustainable, and ESN could not conceal its mounting deficit. (DE 29-4, ¶ 19, at 4). Additionally, further compounding losses visited upon certain

unlucky victims, the Stazes "gave some victim clients preferential treatment by directing ESN employees to pay those client companies' employments taxes and not to pay the obligations for other victims, thus choosing those victims to bear the greatest losses." (DE 29-4, ¶ 19, at 4). Clients, including plaintiff, whose employment taxes remained unpaid at the end of the Stazes' scheme received enforcement letters from the IRS and, at that time, discovered the Stazes' fraud. (DE 19-3 at 473).

## COURT'S DISCUSSION

A. Standard of Review

Summary judgment is appropriate when "there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

In deciding a motion for summary judgment, the court construes evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmovant's favor. Anderson, 477 U.S. at 255. A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v.

4

<u>Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party

must then "set forth specific facts showing that there is a genuine issue for trial." <u>Matsushita Elec.</u>

<u>Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)).

B. Analysis

       Interpretation of an insurance policy in North Carolina is a question of law, and therefore

appropriate for adjudication on motion for summary judgment. <u>See</u> <u>ABT Bldg. Prods. Corp. v. Nat'l</u>

<u>Union Fire Ins. Co.</u>, 472 F.3d 99, 115–16 (4th Cir. 2006) (citing <u>Wachovia Bank & Trust Co. v.</u>

<u>Westchester Fire Ins. Co.</u>, 276 N.C. 348 (1970)). It is well established under North Carolina law

that insurance policies are contracts and are construed using contract law principles. <u>See</u> <u>Gaston</u>

<u>County Dyeing Machine Co. v. Northfield Ins. Co.</u>, 351 N.C. 293, 299 (2000). Accordingly, "[t]he

various terms of the policy are to be harmoniously construed, and if possible, every word and every

provision is to be given effect." <u>Id.</u> at 299.

       "Where a policy defines a term, that definition is to be used." <u>Gaston Cty. Dyeing Mach.</u>

<u>Co.</u> 351 N.C. at 299. "[A]ny undefined, nontechnical word is given a meaning consistent with the

sense in which it is used in ordinary speech." <u>State v. Philip Morris USA, Inc.</u> 363 N.C. 623,

632–33 (2009). To ascertain the ordinary meaning of undefined terms, North Carolina courts

consult standard, nonlegal dictionaries. <u>C.D. Spangler Const. Co. v. Industrial Crankshaft &</u>

<u>Engineering Co., Inc.</u>, 326 N.C. 133, 152 (1990). If, after applying the rules of construction, the

language of a policy is unambiguous, courts will enforce the policy according to its terms. <u>See</u> <u>ABT</u>

<u>Bldg. Prods. Corp.</u>, 472 F.3d at 115–16. On the other hand, where a policy provision remains

ambiguous, it must be construed against the insurer and in favor of the policyholder. <u>Id.</u>

       North Carolina disfavors provisions that exclude coverage. <u>See</u> <u>State Capital Ins. Co. v.</u>

5

Nationwide Mut. Ins. Co., 318 N.C. 534, 538 (1986). Ambiguous exclusionary provisions must be construed against the insurer. Id. Ambiguity is, however, not created simply by assertion of the plaintiff. Instead, ambiguity in a policy provision exists only when, "in the opinion of the court, the language of the policy is fairly and reasonably susceptible to either of the constructions for which the parties contend." Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354 (1970).

The insured has the burden to prove coverage for the claimed loss. N.C. Farm Bureau Mut. Ins. Co. v. Sadler, 365 N.C. 178, 182 (2011). However, where an insurer seeks to rely on a provision excluding coverage, the burden is on the insurer to establish the exclusion. Nationwide Mut. Ins. Co. v. McAbee, 268 N.C. 326, 326 (1966).

The crime coverage part of the policy contains three sections relevant here. Section I contains "insuring clauses" that provide coverage; section II defines terms; and section III contains "exclusions" that create exceptions to coverage provided in section I. This case concerns applicability of the "employee theft" and "funds transfer fraud" insuring clauses. Because the court determines that the "employee theft" insuring clause provides coverage, the court does not reach application of the "funds transfer fraud" insuring clause. Where coverage is provided, the court thereafter addresses defendant's argument that two exclusions apply.

1. Employee Theft Insuring Clause

Pursuant to the employee theft insuring clause, "the company shall pay the parent organization for direct loss of money, securities or property sustained by an insured resulting from theft or forgery committed by an employee acting alone or in collusion with others." (DE 19-3 at 170). "[T]he company" refers to defendant, (DE 19-3 at 115), "the parent organization" refers to

6

plaintiff, (DE 19-3 at 114), and "insured" refers also to plaintiff. (DE 19-3 at 173). Further, the

parties agree that the Stazes' embezzlement constitutes a type of "theft" covered under the clause.

(Def.'s Br., DE 27 at 3–5). The only remaining question is whether the Stazes' qualify as

"employees."

Under definitions in section II, the term "employee" includes "any contractual independent

contractor," which is defined as

> any natural person ndependent [sic] contractor while in the regular service of an
> organization in the ordinary course of such organization's business, pursuant to a
> written contract between such organization, and either (A) such natural person
> independent contractor, or (B) any other entity acting on behalf of such natural
> person independent contractor, for services."

(DE 19-3 at 172). The Stazes undoubtedly constitute "natural person[s]." Further, James Staz

served as principal financial manager, vice-president, and, eventually, president of ESN, and

William Staz "managed and directed the day-to-day operations of ESN" until he was incarcerated

pursuant to a separate conviction in 2008. (DE 19-3 at 94). After release, William Staz "continued

to participate in the operation of ESN, including the preparation of corporate taxes and reports and

daily operation of the company." (DE 19-3 at 94). Based on their ongoing managerial roles in

ESN's payroll and tax services, it follows that the Stazes served as independent contractors in the

"regular service of [plaintiff] in the ordinary course of [plaintiff's] business." Further, the contract

establishing a relationship between plaintiff and the Stazes was in writing. (DE 19-3 at 91).

The second clause of the foregoing definition specifies that, to qualify for coverage, the

parties to a contract for independent contractor services must be plaintiff and either the natural

person who undertakes to perform services or an "entity acting on behalf of such natural person

independent contractor." (DE 19-3 at 91). The Stazes were not parties to the contract between

7

plaintiff and ESN. (DE 19-3 at 91) Therefore, the Stazes' qualify as "contractual independent contractor[s]" only if ESN "act[ed] on behalf of" the Stazes when it contracted with plaintiff.

The policy does not define the terms "acting on behalf of." (DE 19-3 at 171–74). Therefore, the court gives the phrase its ordinary meaning as informed by standard, nonlegal dictionaries. See C.D. Spangler Const. Co. 326 N.C. at 152.

The term "acting on behalf of" may signify either of two distinct meanings. Traditionally, "acting on behalf of" another meant to act within the scope of a formal agency relationship. Behalf, Oxford English Dictionary Online (2016) (entry last updated 1989) (last visited Nov. 1 2016) (emphasis added). By contrast, to "act in behalf of" another meant, more broadly, to "act in the interest of" or "act for the benefit" of another. Id. (emphasis added). However, the Oxford English Dictionary notes that "[i]n recent use we often find on behalf in the sense of in behalf, to the loss of an important distinction." Id. (emphasis in original). Further, Webster's Third New International Dictionary eschews entirely the traditional distinction between "acting on behalf of" and "acting in behalf of," expressly stating that the two phrases are interchangeable and defining both as "in the interest of: as the representative of: for the benefit of." Behalf, Webster's Third Int'l. Dictionary (2002). Pursuant to North Carolina's rule that courts must construe ambiguities in insurance contracts against the drafter, see ABT Bldg. Prods. Corp., 472 F.3d at 115–16, the court will interpret broadly the term "acting on behalf of" to include "acting in the interest of" or "acting for the benefit of" for purposes of the policy.[1]

_____

[1]Although the North Carolina Supreme Court has not addressed directly the distinction in issue here, the North Carolina Court of Appeals has used the terms "on behalf of" and "in behalf of" interchangeably. See Bridges v. Oates, 167 N.C. App. 459, 466 (2004) ("[a] church member may sue on behalf of the church.") (emphasis added) (quoting Nash v. Sutton, 109 N.C. 550, 553 (1891) ("every [congregation] member has such a beneficial interest as would enable him, in behalf of his

8

North Carolina law grants to every corporation "the same powers as an individual to do all things necessary or convenient to carry out its business and affairs[.]" N.C. Gen. Stat. § 55-3-02(a). Therefore, North Carolina corporations have the same capacity as individuals to act on behalf of other entities or individuals. See id. Additionally, the language of the policy itself contemplates the possibility of an "entity acting on behalf of [a] natural person independent contractor." (DE 19-3 at 172). Thus, neither North Carolina law nor the language of the policy precludes a finding that a corporation acted on behalf of another entity or individual. See id.; N.C.G.S. § 55-3-02(a).

Application of the foregoing principles implies that ESN acted on behalf of the Stazes when it contracted with plaintiff. In particular, the Stazes' indictment and guilty pleas reveal that the purpose of ESN's existence was to facilitate the Stazes' embezzlement. (DE 19-3 at 105–7). During the years ESN operated, the Stazes used ESN to embezzle millions of dollars from clients, and there is no evidence in the record that anyone benefitted from ESN's operations other than the Stazes. (See DE 19-3 at 105–7). Indeed, as described in the indictment, the Stazes, "through [ESN], defrauded ESN clients by fraudulently collecting over $11 million from those clients and falsely claiming that the funds would be used to pay federal and state employment taxes when, in reality, the taxes were never paid or paid late and the funds were used to support [the Stazes'] lifestyles." (DE 29-4, ¶ 1, at 1) (emphasis added). In light of these facts, ESN acted "in the interest of," "for the benefit of," and, therefore, "on behalf of" the Stazes when it contracted with plaintiff for the

brethren and associates, to maintain an action [in court.]") (emphasis added)); N.C. State Bar. v. Whitted, 82 N.C. App. 531, 538 (1986) ("The Committee thus properly could conclude that defendant's independent professional judgment on behalf of Mrs. Goodman would be or was likely to be affected by his acceptance of employment by Mrs. Moore.") (emphasis added) (quoting Disciplinary Rule 5-105(A) ("A lawyer should decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment . . .") (emphasis added)).

9

purpose of facilitating the Stazes' embezzlement. Therefore, because every element of the definition is met, the Stazes constitute "contractual independent contractor[s]" and, therefore, "employee[s]" under the policy. (DE 29-4, ¶ 1, at 1).

In support of a contrary position, defendant contends that North Carolina law prohibits a corporation from acting on behalf of another individual or entity. (Def.'s Br. DE 27 at 14–15). In support of this contention, defendant cites North Carolina case law stating that "[a] corporation can act only through its agents, which include its corporate officers." Woodson v. Rowland, 329 N.C. 330, 407 (1991). However, the quoted language is inapposite. First, as discussed above, a North Carolina corporation has the same capacity as an individual to act on behalf of another entity or person. N.C. Gen. Stat. § 55-3-02(a). Second, the language quoted in Woodson establishes only that, if a corporation acts, it must do so through an agent. See Woodson, 329 N.C. at 407. Woodson does not stand for the broader proposition that a corporation cannot act as agent of a principal, and indeed, such an interpretation would flatly contradict the language of the North Carolina Business Corporation Act. See id.; N.C. Gen. Stat. § 55-3-02(a). Further, Woodson neither decides nor addresses whether a corporation may "act in the interest of" or "act for the benefit of" an owner or owners who fraudulently use the corporation as part of a larger scheme to embezzle clients' funds. See Woodson 329 N.C at 334–36. Consequently, nothing in North Carolina law prohibits a finding that ESN "acted on behalf of" the Stazes for purposes of the policy.

In sum, unless an exclusion applies, the policy's employee theft coverage provision applies to the Stazes' embezzlement and entitles plaintiff to reimbursement.

2. Exclusions

Two exclusions are relevant to determine whether plaintiff can recover under the policy.

10

First, exclusion (A)(14) ("authorized representative exclusion") withholds coverage of

> loss or damage due to theft, forgery, computer fraud, funds transfer fraud, money
> orders and counterfeit currency fraud, credit card fraud or other fraudulent, dishonest
> or criminal act (other than robbery or safe burglary) committed by any authorized
> representative of an insured, whether acting alone or in collusion with others,
> provided that this exclusion (A)(14) shall not apply to otherwise covered loss under
> insuring clauses (A), employee theft coverage, or (I) client coverage, resulting from
> theft or forgery committed by an employee acting in collusion with such authorized
> representative.

(DE 19-3 at 176). It follows from the court's analysis of plaintiff's claims under the employee theft

insuring clause that the authorized representative exclusion does not apply. Specifically, the third

clause of the authorized representative exclusion states that it does not apply to "otherwise covered

loss under Insuring Clause[] (A)." Insuring Clause (A) is the employee theft insuring clause

discussed above. (DE 19-3 at 72). As set forth in the previous section, plaintiff's loss is covered

under the employee theft insuring clause; therefore, the authorized representative exclusion does not

bar plaintiff's recovery.

> Second, exclusion (B)(1)(a) ("independent contractor exclusion") withholds coverage of

> loss caused by any broker, factor, commission merchant, consignee, contractor,
> independent contractor (other than a contractual independent contractor), or other
> agent or representative of the same general character.

The independent contractor exclusion states that it does not apply to loss caused by a contractual

independent contractor. As set forth in the previous section, the Stazes meet the definition of

contractual independent contractors. Thus, the independent contractor exclusion does not bar

plaintiff's recovery.

　　3. Coverage

　　In sum, because plaintiff has satisfied its burden to establish coverage under the employee

theft insuring clause and defendant has not met its burden to show that an exclusion applies, plaintiff

is entitled to declaratory judgment that defendant is obligated to reimburse plaintiff's losses due to the Stazes' embezzlement.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is DENIED, and plaintiff's motion for summary judgment is GRANTED. It is DECLARED and ADJUDGED that defendant owes a duty under the policy to pay plaintiff for the damages it sustained due to the unlawful taking of $492,350.53 and that defendant has breached its duties under the policy by refusing to pay plaintiff for the unlawful taking. However, before entry of final judgment, the court must determine issues regarding costs, fees, and interest. Accordingly, plaintiff is DIRECTED to file additional briefing in support of its prayer for costs of court, attorney's fees, and interest allowed by law within 21 days of this order. Defendant shall have 14 days to respond, after which time the court shall rule on all remaining issues raised by the instant motion and enter final judgment.

SO ORDERED, this the 14th day of November, 2016.

LOUISE W. FLANAGAN
United States District Judge